IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SARAH B. KALNAJS,

                    Plaintiff,                          OPINION & ORDER

        v.
                                                          16-cv-62-jdp
THE LILLY EXTENDED DISABILITY PLAN,

                    Defendant.

Plaintiff Sarah B. Kalnajs worked as a pharmaceuticals sales representative for Eli Lilly and Company until 2000, when she became disabled. She began receiving long-term disability benefits under defendant the Lilly Extended Disability Plan in 2001. But in 2014, after learning that Kalnajs had worked for nearly a decade as an internationally acclaimed dog trainer and obtaining multiple doctors' reports indicating that Kalnajs was able to perform some work despite several mental and physical conditions, the Disability Plan terminated her benefits. Kalnajs filed suit, claiming that the termination of benefits violated her rights under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B). The parties have filed cross-motions for summary judgment. Dkt. 15 and Dkt. 18. The record contains conflicting evidence regarding Kalnajs's physical and mental health. But the decision to terminate benefits is supported by evidence in the record, and the Disability Plan explained its reasons for that decision. Under the deferential standard of review applicable to this case, the Disability Plan is entitled to summary judgment.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Kalnajs worked as a pharmaceuticals sales representative for Eli Lilly and Company until 2000. As an Eli Lilly employee, Kalnajs was eligible for coverage under Eli Lilly's Employee Welfare Plan, which is composed of various "component plans," including the Lilly Extended Disability Plan. Both plans are covered by ERISA and administered by the Eli Lilly Employee Benefits Committee (EBC).

Kalnajs stopped working in September 2000 because of medical issues—doctors suspected Lyme disease or a severe viral infection. She filed a claim for long-term disability benefits under the Disability Plan. Under the Disability Plan's definition, an employee is disabled if, in the first 24 months after the end of the employee's short-term disability benefits, he or she is unable

> to engage, for remuneration or profit, in the Employee's own occupation . . . provided that the inability results from the Employee's illness or accidental bodily injury and such illness or injury requires the Employee to be under the regular care of a Licensed Physician.

Dkt. 12-12, at 238. After the first 24 months, the employee is disabled if he or she is unable

> to engage, for remuneration or profit, in any occupation consistent with the Employee's education, training, and experience provided that the inability results from an illness or accidental bodily injury that requires the Employee to be under the regular care of a Licensed Physician.

*Id.*[1] In May 2001, the EBC approved Kalnajs's long-term disability benefits claim under the first definition.[2] (The record is unclear, but it appears that at the time, the EBC determined

---

[1] This definition was amended in 2015, but the amendments are stylistic only and do not change the substantive requirements of the definition. *See* Dkt. 12-12, at 174, 206.

[2] The EBC delegated the task of reviewing long-term disability claims to several different entities over the years. For simplicity, the court will use "EBC" to refer to the EBC's delegates, too.

that Kalnajs was disabled as a result of chronic fatigue syndrome and Lyme disease. *See* Dkt. 12-4, at 100.) The question in this case is whether Kalnajs now meets the second definition of disabled. Over the intervening years, Kalnajs provided the EBC with documentation supporting her contention that she was disabled, while the EBC independently collected evidence supporting the opposite finding.

In 2002, Kalnajs asked the EBC whether she could start a short-term job to determine if she would be able to return to work full time. She proposed a part-time, hourly retail position. An EBC representative told Kalnajs that "this employment would be acceptable . . . given the nature of the work and minimal hours" but that she should contact the EBC "if she decides to seek any other form of employment." *Id.* at 81. Despite the EBC's approval, Kalnajs did not take the retail job, but did briefly work part-time at a local gym. Around the same time, the EBC found information online indicating that Kalnajs was "a full-time professional Applied Animal Behaviorist and the owner of Fundamentally Dogs Canine Behavior consultants." *Id.* The EBC did not immediately follow up on this information.

In 2010, Kalnajs gave the EBC medical records from 2009 that indicate that she was being treated for degenerative disk desiccation and back, hip, buttock, and ankle pain. She also indicated that she had been hospitalized for "depression, anxiety, agoraphobia, and substance abuse." Dkt. 12-2, at 5. She claimed she suffered from the following medical conditions:

- Migraine headaches
- Herniated discs
- Insomnia
- Irritable Bowel Syndrome
- Colitis
- Reflux
- Tendonitis
- Neuroma
- Weight gain

3

- Severe chronic depression
- General anxiety disorder
- Agoraphobia
- Drug dependency

Kalnajs also informed the EBC that back in 2003, she had become a certified dog behavior consultant, had worked occasionally as a dog trainer ever since, and she earned a "modest income" from sales of a video of a talk she gave to a local dog rescue group in 2005. *Id.*

This information prompted the EBC to perform its own investigation in 2010. It discovered that Kalnajs owned and operated a dog consulting business, Blue Dog Training & Behavior, LLC. Blue Dog's website listed 28 seminars that Kalnajs had presented since 2008 all over the county and internationally. The website advertised nine upcoming seminars and a dog-training DVD featuring "a lively presentation" by Kalnajs. *Id.* at 45. The website also listed testimonials from clients praising Kalnajs's in-home dog training and pet sitting services. Another website described Kalnajs as "one of the most prominent dog behaviour experts in the word." *Id.* at 57.

When the EBC confronted Kalnajs about the work she appeared to perform for her business, Kalnajs confirmed that she was earning "a bit of income" by training dogs and giving seminars. *Id.* at 102. She explained that she recently gave a six-hour talk at an international seminar and had appeared at "a handful" of other international and domestic seminars. *Id.* She was also training dogs, seeing two or three clients a week. But, she explained, she was not doing a very good job:

> I have had to cancel approximately 90% of my commitments at or very near to the last minute. Most clients were getting rescheduled 3 or 4 times before I would see them (if I saw them at all) and my reputation has taken a severe nosedive during this time. No one wants to refer to me because "word on the street" is I'm always sick and can't follow through.

*Id.* She explained that she requires a service dog or human travel companion whenever she travels for seminars and requires the seminar hosts to provide a range of accommodations for her. She claimed not to leave the house except for appointments with her doctors and "a rare dog training client." *Id.* at 104. She explained that in the past, she had tried to maintain a regular job but was "fired each time due to [her] attendance." *Id.* at 102.

In September 2010, Kalnajs's primary care physician, Dr. Robert Cambray, sent the EBC a summary of her medical conditions. He explained that he saw her "on an approximately monthly basis" concerning her chronic pain, anxiety, headaches, and intestinal problems. *Id.* at 124. He noted that he prescribed her several medications for pain and anxiety but had not been able to improve the symptoms that she reported. He opined,

> Given her current need for medications, her frequent reports of disabling anxiety and inability to carry out a regular work schedule, I would find it difficult to believe that she could hold down a regular job requiring regular attendance. This opinion, however, is counter balanced against her abilities to travel for her work and to perform in dog behavioral seminars around the world. So, to a certain extent, she is able to function in the world of employment, but it seems to be sporadic and significantly impacted by her mental health and pain syndromes.

*Id.* at 125.

In October 2010, Dr. Ryan Hurt of the Mayo Clinic's Department of Internal Medicine sent the EBC a letter explaining that he was evaluating Kalnajs and had "observed that she has numerous medical conditions that would limit her in productive work." *Id.* at 35. He recommended continuing "her current disability status" until the evaluation was complete, at which point "we can make further recommendations about returning to work in the future." *Id.* Around the same time, Dr. Keith Rasmussen, a psychiatrist at Mayo, diagnosed Kalnajs with panic disorder with agoraphobia; chronic, severe major depressive disorder; and chronic

pain syndrome. He noted that "she very much needs ongoing mental health care" and that "she does meet criteria for a psychiatric disability." Dkt. 12-3, at 100.

The EBC asked Dr. Philip Marion to provide an independent report on Kalnajs's physical condition. Dr. Marion spoke with Dr. Cambray, reviewed Kalnajs's medical records, and concluded in an October 21, 2010 report that based on the clinical evidence, Kalnajs did not have a physical condition that impaired her ability to work. He noted that Dr. Cambray agreed that Kalnajs's "complaints of pain and reported incapacity [are] inconsistent with the lack of clinical findings and her current occupational activities" and "indicated there are no acute clinical medical issues that he is specifically treating that are physically precluding [her] from working." Dkt. 12-2, at 30-31.

In December 2010, the EBC arranged for an independent medical examination of Kalnajs by Dr. Dennis Brown. He concluded that Kalnajs "is not disabled from work due to musculoskeletal, neurological, or other identified non-psychiatric conditions" but did not issue an opinion regarding Kalnajs's psychological or psychiatric conditions. Dkt. 12-10, at 41. He noted that Kalnajs's "medical records identify physical and 'professional' activities that are not consistent with an inability to work," such as traveling internationally, running, and "giving presentations or seminars, which typically are pre-scheduled events necessitating the ability to perform at a defined future date." *Id.* at 42-43.

In February 2011, the EBC arranged for a second independent medical examination by Dr. Kenneth Robbins. He concluded that although Kalnajs "had been able to maintain her business and travel and teaching as a dog trainer," her psychiatric condition had deteriorated to the point where she had "significant restrictions and limitations [and was] unable to perform any gainful employment on a full-time basis at this time and likely unable to perform any

6

gainful employment on even a part-time basis." *Id.* at 50-51. He noted that Kalnajs's "treatment plan has not been optimal for return to work," but that "[w]ith proper treatment, . . . she would improve to a point where she would be able to return to gainful employment." *Id.*

The EBC continued to approve Kalnajs's benefits through 2014 "to allow [Kalnajs] to establish treatment with a mental health provider." Dkt. 12-5, at 110. Between 2012 and 2014, the EBC collected additional records concerning Kalnajs's medical conditions. In 2012, Dr. Cambray opined that Kalnajs was disabled and "probably" would never be able to return to work, although "hopefully [her condition] will improve with psychiatric care." Dkt. 12-10, at 79. In October 2012, Dr. Amy Connell, a psychiatrist, conducted an initial psychiatric evaluation of Kalnajs and noted that Kalnajs appeared "unable to function sufficiently to maintain employment." Dkt. 12-9, at 3. Dr. Connell referred Kalnajs to a psychologist, Dr. Craig Sawchuck, who treated Kalnajs from January to May 2013. In March 2013, Dr. Sawchuck stated that he was "unable to fairly assess" Kalnajs's ability to return to work "due to [his] limited contact with [her]." *Id.* at 2. Dr. Marci Gittleman, a psychologist, saw Kalnajs in September 2013 for an initial appointment and noted that Kalnajs was "much more disabled than is typically treated in this setting" and was "too disabled to work." Dkt. 12-11, at 66. Kalnajs cancelled her subsequent appointments with Dr. Gittleman and never saw her again. In a December 2013 letter to the EBC, Dr. Gittleman opined that Kalnajs "clearly needs help with mental issues and is not able to sustain employment in any type of situation." Dkt. 12-5, at 112. In March 2014, Dr. Christine Costanzo, a psychiatrist, conducted an initial psychiatric evaluation of Kalnajs and concluded that Kalnajs was unable to work. Kalnajs had one more session with Dr. Costanzo, in which Dr. Costanzo recommended weekly psychotherapy. Kalnajs then cancelled her remaining appointments. In June 2014, Dr. Hyzer saw Kalnajs for

chronic back pain, migraines, depression, and anxiety, refilled her prescriptions, and noted that she was about to leave for England.

In April 2014, a nurse case manager reviewed Kalnajs's claim and determined that the medical records supported approving Kalnajs's claim for an additional three months "to allow for ongoing treatment, therapy and medication management with new providers." *Id.* at 113. The nurse mentioned that Kalnajs's symptoms, including "severe agitation, daily panic attacks, severe impairment in reasoning and judgment and inability to perform daily simple tasks," may affect her ability to perform "detailed cognitive tasks at work and impact overall job performance as well as raise concern for safety." *Id.* at 112. The nurse concluded that Kalnajs could not perform "any occupation at this time due to risks involved including decompensation of symptoms." *Id.* at 113.

In August 2014, the EBC asked Dr. Daniel Harrop, a psychiatrist, to provide an independent report on Kalnajs's mental condition. He concluded that there was "no clinical evidence indicating an acutely severe debilitating or incapacitating psychiatric disorder that would preclude work." Dkt. 12-11, at 79. He acknowledged that Kalnajs had symptoms of anxiety and depression, but found "no indication" that Kalnajs was "impaired from her regular job." *Id.* He noted that there were "minimal and sporadic" medical records "because of [Kalnajs's] noncompliance with care" and that there was "no formal mental status examination documenting the extent of the problems reported and justifying the functional problems claimed" by Kalnajs. *Id.* He also opined, "Given the fact that [Kalnajs] is running her own business and able to travel, there is no clinical evidence to substantiate or warrant a determination of impairment at this time." *Id.* at 78.

On August 27, 2014, the EBC sent Kalnajs a letter notifying her that her benefits would be terminated on October 1. It explained that although her claim had "been approved in the recent past to allow time . . . to establish treatment with mental health," Kalnajs had "miss[ed] several appointments with treating providers, . . . changed providers several times, and . . . not followed through with treatment plans." Dkt. 12-9, at 64. It also noted that Kalnajs's international travel as a dog trainer contradicted Dr. Hyzer's statement that her back pain and migraines rendered her unable to leave her house, drive, or sit for more than five minutes as a time. Because Kalnajs had "not provided objective medical documentation to establish that [her] condition continues to meet the definition of disability," the EBC denied her claim. *Id.*

Kalnajs appealed. She provided a history of her prescriptions; an October 2014 letter from Dr. Hyzer opining that Kalnajs's physical and mental health conditions and the medications that she was takings to treat them "prevent her from [working in] most occupations," Dkt. 12-6, at 6; a December 2014 letter from a licensed clinical social worker, Paula Gorman, stating that Gorman considered Kalnajs disabled; and a October 2014 police report indicating that a Disability Plan representative called the police, believing Kalnajs may have been suicidal, after informing Kalnajs about the termination of her benefits.

Kalnajs also submitted her own affidavit averring that because of her mental and physical conditions, she cannot drive a car, "rarely leave[s] the house and spend[s] most of the day in bed." *Id.* at 53. She explained that she has been holding dog-training seminars for years but that they never amounted to full-time work and that she has cancelled many of them due to her health problems. Kalnajs enclosed two letters from international clients who had hosted Kalnajs's seminar in the past. One client from Australia listed the many accommodations Kalnajs required, noted that she cancelled many private consultations, described her as "utterly

impossible to deal with at times," and said that "so much damage was done by her behaviour" that they "no longer wish to remain friends on a personal level." *Id.* at 67-68. Despite that, the client intended to continue a professional relationship, describing Kalnajs as "one of the most knowledgeable trainers in the world" and noting that her "seminar was very well received and [that she] presented it very professionally, with the good humour she is known for." *Id.* The second client letter, from Poland, contained similar information: Kalnajs cancelled all of the private consultations she had scheduled and "required some extra care and patience," all of which "influenced . . . how people evaluated the seminar. The opinions weren't so good." *Id.* at 70. Despite all of these problems, the client still described Kalnajs's seminar as "great." *Id.*

In January 2015, the EBC asked Dr. Tatiana Sharahy to provide an independent report on Kalnajs's physical condition. Dr. Sharahy opined that "the records provided do not substantiate physical restrictions or limitations" and that Kalnajs "can be expected to perform work." Dkt. 12-10, at 4. She acknowledged that a recent letter from Dr. Hyser stated that Kalnajs had functional limitations of sitting or standing for no more than 30 to 45 minutes and lifting no more than 10 pounds, but noted that Dr. Hyser did not provide a rationale for these restrictions or perform objective range of motion, muscle strength, or physical performance evaluations. She also noted that these limitations were inconsistent with Dr. Hyser's notes that Kalnajs "moves well" and was traveling to England soon. *Id.* at 3.

The EBC also asked Dr. Jean Dalpe to provide an independent report on Kalnajs's psychiatric condition in January 2015. Dr. Dalpe opined that "the clinical progress notes do not support the severity of psychiatric symptoms that would cause functional psychiatric impairment leading to any restrictions or limitations." Dkt. 12-9, at 77. She noted that the most recent clinical progress note available was from Kalnajs's June 2014 appointment with

Dr. Hyzer, but Dr. Hyzer did not perform a psychiatric examination then. She concluded that Kalnajs's condition "does not require any psychiatric restrictions or limitation as of" October 1, 2014. *Id.* at 76.

In March 2015, the EBC arranged for an independent medical examination by Dr. Joseph Burgarino, a psychiatrist and neurologist. Dr. Burgarino noted that Kalnajs "has engaged in therapy in fits and starts," with "[m]any failed appointments," and pointed out that "[t]his pattern is not at all unusual for a patient with agoraphobia." Dkt. 12-11, at 99. He diagnosed Kalnajs with

- Panic disorder with agoraphobia
- Chronic recurrent Major Depressive illness
- Dysthymia, and generalized anxiety disorder
- Mixed personality disorder with dependent and avoidant features
- Mixed personality disorder with defendant, avoidant, histrionic, and obsessive-compulsive features
- Fibromyalgia
- Hypothyroidism

*Id.* at 100. He recommended that Kalnajs undergo "[c]omprehensive medical neuropsychiatric evaluation" and attend weekly or biweekly psychotherapy sessions. *Id.* He concluded, "Based upon the severity, persistence, and length of the neuropsychiatric conditions as described above . . . Ms. Kalnajs is at this time totally and permanently disabled. . . . [A]ll gainful employment is . . . precluded." *Id.* at 101.

In April 2015, the EBC arranged for another independent medical examination by Dr. William Fowler concerning Kalnajs's physical condition. He opined that his "physical examination findings neither refute nor support her report of chronic frequent migraine headaches, or her report of chronic fatigue syndrome[, but] are consistent with . . . fibromyalgia." *Id.* at 92. Considering only Kalnajs's physical condition, he concluded that she

would be able to work in sedentary positions. He noted that Kalnajs's "relatively excessive use" of narcotic analgesics "may be further exacerbating" her psychological issues and recommended replacing narcotics with cognitive behavioral psychology counseling, physical therapy, and massage therapy. *Id.* at 93-94. Throughout his report, Dr. Fowler noted that his opinions concerned Kalnajs's physical condition only. He mentioned that he "definitely consider[ed] her psychologic or mental health issues to have further significant impact on her ability to positively cope with her" physical condition. *Id.* at 94.

Finally, the EBC hired an investigator to determine Kalnajs's recent activity level. The investigator, Ron Worley, found evidence online that Kalnajs had worked as a personal trainer at a gym for 8 years; had owned and operated Blue Dog since 2003; had given expert testimony on dogs in civil and criminal cases; had given 67 seminars around the world since 2000; and had two upcoming seminars scheduled in 2015. Worley noted that Blue Dog had been voted a 2014 Best of Madison silver business. His report included social media posts indicating that Kalnajs cancelled a seminar in Denver in April 2014 "[d]ue to last minute unforeseen issues at the host facility," but traveled to the United Kingdom in June 2014 for "the third time in as many weeks." Dkt. 12-12, at 10. In some posts, Kalnajs represented that dog training was her "full time career" and that she worked with "animal actors" in television, film, and commercial spots and had been featured on a television news show for her work. *Id.* at 18, 20. Several Yelp reviews from 2014 and 2015 praised Kalnajs as a dog trainer. One reviewer said that Kalnajs "made herself available at all time. She stepped out of family functions to call me, to walk me through certain steps." *Id.* at 21. Another reviewer described Kalnajs as "incredibly professional [and] smart . . . . the best-qualified trainer I have encountered, who is well-prepared to improve even the most problematic canine behavior." *Id.* at 22. Kalnajs was recommended to a third

reviewer by another trainer who had attended one of Kalnajs's seminars. Photographic posts also indicated that during 2015, Kalnajs exercised on a treadmill, went hiking, traveled in a car, walked outside, went to a book signing where she was the second in a line of over 500 people, wrote a book, and went to the mall. In one post, Kalnajs complained of "insomnia, weight gain, fits of crying & sweating," which she attributed to peri-menopause. *Id.* at 19.

On May 5, 2015, the EBC denied Kanlajs's appeal. It explained that Kalnajs no longer met the Disability Plan's definition of disabled in two respects. First, the most recent medical records indicated that she was last treated by licensed physicians in April and June 2014. The EBC determined, based on this information, that Kalnajs was not under the regular care of a licensed physician. Second, a review of the medical records and other information pertinent to Kalnajs's claim indicated that Kalnajs could work. As for Dr. Burgarino's conclusion that Kalnajs was totally and permanently disabled, the EBC "noted a variety of conflicting information provided by [Kalnajs's] prior physician reviews and publicly available information." *Id.* at 28. It found that Kalnajs's international seminars and dog training activities "appear to contradict [her] claimed disability." *Id.* at 28. It also noted that Kalnajs's social media posts indicate that she travels to train dogs, walks in public, hikes, and performs other activities outside the house, contradicting her claim on appeal that she stays in her bedroom and rarely leaves the house. It concluded, "[B]ased on the information you provided, related documentation and the applicable Plan provisions, the [EBC] determined that you are not disabled under the terms of the Plan." *Id.* at 29.

Kalnajs filed this lawsuit on January 26, 2016. The court has subject matter jurisdiction over Kalnajs's claim under 28 U.S.C. § 1331 because it arises under federal law.

ANALYSIS

The parties do not dispute the facts in the record. Their summary judgment motions concern, instead, the EBC's determination, based on those facts, that Kalnajs is not disabled. Were the court to decide the issue de novo, disputes over the credibility of Kalnajs's statements and the permissible inferences to draw from the record would preclude entry of summary judgment in favor of either party. But under the deferential standard of review required by the Disability Plan, summary judgment in the Disability Plan's favor is appropriate, because the Disability Plan provided Kalnajs a full and fair review and a reasoned explanation for its determination.

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where, as here, the parties have filed cross-motions for summary judgment, the court "look[s] to the burden of proof that each party would bear on an issue of trial; [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If either party cannot create such a dispute, summary judgment against that party is appropriate. "As with any summary judgment motion, this [c]ourt reviews these cross-motions 'construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party.'" *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502

14

F.3d 740, 748 (7th Cir. 2007)). In this case, Kalnajs bears the burden of proving her entitlement to long-term disability benefits. *See Santaella*, 123 F.3d at 461.

Under ERISA, a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The default standard of review is de novo, but courts apply arbitrary-and-capricious review if the terms of the plan clearly confer discretionary authority to the administrator. *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 329-33 (7th Cir. 2000); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Here, section 6.03(a) of the Disability Plan grants the EBC, as the administrator,

> the discretion to construe the terms of the Plan and to determine whether an Employee has incurred a Disability, whether the Employee has submitted Objective Medical Evidence, . . . and any other matter concerning an Employee's eligibility for benefits under the Plan.

Dkt. 12-12, at 260. This language clearly confers discretionary authority to the EBC, so the court must apply the arbitrary-and-capricious standard of review. Kalnajs makes two arguments to the contrary, but each argument fails.

First, Kalnajs argues that the Disability Plan grants the EBC discretion to determine all matters concerning an employee's eligibility for benefits *except* when reviewing its prior determinations. She points to section 6.03(b), which states:

> The [EBC] shall have the discretion to make any finding of fact necessary for the determination of any benefit payable under the Plan. The [EBC] may review its prior determination from time to time to ascertain whether there has been any change in the facts or conditions on which the determination was based.

*Id.* She argues that because the final sentence about review of prior determinations is the only sentence that does not expressly mention discretion, "the most common-sense reading" is that the Disability Plan does not extend discretion to review of prior determinations. Dkt. 17, at 8. But the most common-sense reading of section 6.03 is simply to take it at its word: the EBC "shall have the discretion to . . . determine . . . any . . . matter concerning an Employee's eligibility for benefits under the Plan." Dkt. 12-12, at 260. The sentence concerning review of prior determinations makes clear that continuous review is a mechanism that the EBC may employ to determine an employee's eligibility; it does not, through its silence, impose heightened limitations on the EBC's decision-making authority when using the continuous-review mechanism.

Second, Kalnajs argues that pursuant to the Welfare Plan, the Disability Plan is governed by Indiana law, which disfavors discretionary clauses. Kalnajs points to the Welfare Plan's choice-of-law provision, which provides:

> Except as otherwise provided in a Component Plan . . . the Component Plans shall be governed by and administered under ERISA, and, to the extent not preempted thereby, under the laws of the State of Indiana.

*Id.* at 166. The flaw in Kalnajs's argument is immediately apparent: ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a); *see also* § 1144(b)(2)(A)-(B). Section 6.03 of the Disability Plan relates to an employee benefit plan, so ERISA, not state law, applies regardless of any choice-of-law provision. And even if the choice-of-law provision were relevant, the Welfare Plan adopts Indiana law only to the extent that it is not preempted by ERISA.

So the court will review the EBC's denial of benefits under the arbitrary-and-capricious standard of review. This standard "turns on whether the plan administrator communicated

'specific reasons' for its determination to the claimant, whether the plan administrator afforded the claimant 'an opportunity for full and fair review,' and 'whether there is an absence of reasoning to support the plan administrator's determination.'" *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009) (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832-33 (7th Cir. 2009)). This standard of review "is not a euphemism for a rubber-stamp." *Id.* at 483. The scope of the court's review is limited to the record that the Plan had before it at the time that the benefits determination was made. *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994).

When Kalnajs's benefits were terminated, the definition of disability that applied to her—the definition that she had to meet to continue to receive benefits—was:

> [T]he inability of an Employee to engage, for remuneration or profit, in any occupation consistent with the Employee's education, training, and experience provided that the inability results from an illness or accidental bodily injury that requires the Employee to be under the regular care of a Licensed Physician.

Dkt. 12-12, at 238. The EBC explained in its final denial letter that Kalnajs did not meet this definition because (1) she was not under the regular care of a licensed physician and (2) she was able to engage for profit in an occupation consistent with her training and experience.

The EBC's first reason for denying Kalnajs's claim is easily disposed of: the Disability Plan's definition of disability does not require the employee to be under the regular care of a licensed physician, so even if the court assumes that Kalnajs was not receiving regular care, she could still be disabled under the Disability Plan. The Disability Plan simply requires that an employee suffer from an illness or accidental bodily injury that *requires* the regular care of a licensed physician—and there appears to be a consensus among Kalnajs's treatment providers that her mental condition does require regular care and treatment. Kalnajs may not be getting

the treatment she should be getting, but that does not mean that she is not disabled under the Disability Plan. The opinions that defendants cite to support their argument that Kalnajs was not disabled because she was not receiving regular care are based on definitions of disability that clearly require the employee to receive regular care. *See, e.g.*, *Eichacker v. Paul Revere Life Ins. Co.*, 354 F.3d 1142, 1144 (9th Cir. 2004) ("The policy defines 'total disability' to require that, due to injury or sickness, the claimant is . . . receiving a physician's care."). The definition of disability at issue in this case lacks that requirement, so a decision to deny benefits to Kalnajs solely because she was not under the regular care of a licensed physician would be arbitrary and capricious.

But the lack of regular care was not the EBC's sole reason for terminating Kalnajs's benefits. The EBC explained that Kalnajs also did not meet the definition of disabled because she could work. This decision reflects a reasonable interpretation of the Disability Plan's terms: the definition of disability requires that the employee be unable to engage, for profit, in any occupation consistent with her training. So if an employee is able to work in a job she is trained for, she does not meet the definition. And the decision finds rational support in the record: although some of Kalnajs's treating physicians and the EBC's examining physicians concluded that Kalnajs's physical and mental conditions rendered her totally unable to work, those opinions were countered by others' conclusions that Kalnajs was able to work and evidence that Kalnajs was, in fact, working. The EBC credited recent evaluations by Dr. Harrop, Dr. Sharahy, Dr. Dalpe, and Dr. Fowler. Each opined that Kalnajs could work in some occupation and, as a result, offer a sufficient basis for the EBC's conclusion that Kalnajs could work. The EBC noted Dr. Burgarino's contrary conclusion but explained that it discounted this conclusion because of the "conflicting information provided by prior physician reviews and publicly

available information." Dkt. 12-12, at 28. And the EBC was within its rights to rely on surveillance evidence in reaching its decision. *See Marantz v. Permanente Medical Group, Inc. Long Term Disability Plan*, 687 F.3d 320, 329 (7th Cir. 2012). The EBC fulfilled its duty of explaining its reasoning, and under the arbitrary-and-capricious standard, the court may not second-guess the EBC's decision to credit some expert opinions over others. The EBC's determination that Kalnajs did not meet the Disability Plan's definition of disabled because she could work was not arbitrary or capricious.

Kalnajs makes several arguments that the EBC's determination was arbitrary and capricious, but none has merit. First, she complains that the EBC did not explain why it did not accept Dr. Hyzer's opinion. But Dr. Hyzer opined in October 2014 that Kalnajs could not engage in "most occupations," Dkt. 12-6, at 6, that is, that she *could* engage in some occupations. This opinion does not contradict the EBC's determination that Kalnajs could work and is more recent than Dr. Hyzer's 2013 prediction that Kalnajs could not work for the "foreseeable future." Dkt. 12-10, at 74. The EBC's failure to discuss Dr. Hyzer's opinions in detail did not deny Kalnajs the opportunity for a full and fair review. *See Majeski*, 590 F.3d at 484 ("A plan administrator need not delve into medical evidence that is irrelevant to its primary concern. Nor must plan administrators annotate every paragraph of a thousand-page medical record.").

Second, Kalnajs complains that Lilly relies on 2010 reports by Dr. Cambray, Dr. Marion, and Dr. Brown but that the EBC did not mention these reports in its final decision letter. But just as with Dr. Hyzer's opinions, the EBC was not required to mention five-year-old reports supporting its decision in its final decision letter. The more recent information that the EBC explicitly relied on in its denial letter provided a sufficient basis for its decision.

Third, Kalnajs argues that many of her treatment providers and two of the EBC's examining physicians diagnosed her with serious psychiatric disorders. This is true. There is no doubt, based on this record, that Kalnajs suffers from serious mental health issues. But that is not the relevant inquiry under the Disability Plan. The question is whether Kalnajs's mental and physical conditions render her unable to engage in *any occupation*. Multiple physicians answered this question in the negative—that is, despite her conditions, Kalnajs is able to engage in an occupation consistent with her education, training, and experience. It was not arbitrary and capricious for the EBC to rely on these physicians' opinions.

Finally, Kalnajs argues that the surveillance evidence gathered by the EBC identifies only isolated episodes of activity and does not show "that Kalnajs could engage in such activity on a sustained basis as required by a regular occupation." Dkt. 21, at 12. But again, that is not the relevant inquiry under the Disability Plan. The surveillance evidence shows that Kalnajs is engaging in an occupation for profit consistent with her education, training, and experience: she earns money working as a dog trainer. Her dog-training salary may not be equal to the income she could earn as a pharmaceutical sales representative or in some other "regular occupation," but under the Disability Plan's terms, that simply does not matter. Kalnajs's dog-training activities are not isolated and infrequent, She is engaging in an occupation for profit. And even if the court disregarded the surveillance evidence gathered by the EBC, the information that Kalnajs herself provided to the EBC confirms that she has been earning money as a dog trainer. Kalnajs readily admitted that she had become a certified dog behavior consultant in 2003 and since then has held multiple seminars, sold copies of her dog-training DVD, and trained and cared for others' dogs. She provided two letters from seminar hosts that indicate that although Kalnajs is very difficult to work with, people are still willing to work

with her because she is "one of the most knowledgeable trainers in the world." Dkt. 12-6, at 68.

The EBC determined, based on the evidence that Kalnajs was working as a dog trainer and multiple doctors' opinions that Kalnajs could perform some types of work, that Kalnajs was not disabled as defined by the Disability Plan. The EBC's decision to terminate Kalnajs's benefits was not arbitrary and capricious, so the court will grant summary judgment in Lilly's favor and dismiss the case.

ORDER

IT IS ORDERED that:

1.  Plaintiff Sarah B. Kalnajs's motion for summary judgment, Dkt. 15, is DENIED.

2.  Defendant the Lilly Extended Disability Plan's motion for summary judgment, Dkt. 18, is GRANTED.

3.  The clerk of court is directed to close this case.

Entered June 14, 2017.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge